# ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT

2007 APR 25 P 3: 44

CLERK
SO. DIST. OF GA.

GIA HEGRE,                          *
                                    *
          Plaintiff,                *
                                    *
     v.                             *          CV 103-108
                                    *
ALBERTO-CULVER USA, INC.,           *
d/b/a BEAUTY SYSTEMS GROUP, INC.,   *
d/b/a SALLY BEAUTY COMPANY,         *
d/b/a MACON BEAUTY SYSTEMS,         *
                                    *
          Defendants.               *

## O R D E R

Plaintiff brought the captioned case pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, 42 U.S.C. § 1981, and Georgia law. Presently pending are Defendants' motion for summary judgment (doc. no. 33), Defendants' motion to strike and to take disciplinary action against Plaintiff's counsel (doc. no. 69), and Plaintiff's motions to amend her complaint and to strike. (Doc. nos. 73 & 89.) Upon the following, Defendants' motion for summary judgment is **GRANTED**, Defendants' motion to strike is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's motions are **DENIED**.[1]

---

[1]Although the captioned case has been consolidated with a companion case, Hegre v. Alberto-Culver USA, Inc., et al., CV 105-031 (S.D. Ga. Mar. 4, 2005), for the purposes of any prospective trial, the Court does not consider any evidence or arguments raised in that case herein. Although the parties in both cases are identical, the companion case, which involves different claims, was not filed until well after the expiration of the discovery period in the above-captioned case and more than two months after Defendants moved for summary judgment. The parties have filed voluminous briefing, and have had ample opportunity to present any

# I.  STATEMENT OF THE CASE

In her amended complaint,[2] Plaintiff, a white female, contended that Defendants: (1) violated Title VII by (a) failing to promote her, (b) retaliating against her for opposing racially discriminatory hiring practices, and (c) subjecting her to a hostile work environment; (2) violated the ADA by (a) refusing to accommodate her disability and (b) overworking her and terminating her in retaliation for requesting accommodation; and (3) violated § 1981 by refusing to negotiate Plaintiff's contract on account of her gender and her objections to racially discriminatory hiring practices. (Am. Compl. ¶¶ 218, 222, 224, 227.)  Plaintiff also contended that Defendants are liable because her supervisor, District Manager Steve Norris, "intentionally inflicted severe emotional harm" upon her.  (Id. ¶ 230.)

In the face of Defendants' pending motion for summary judgment, Plaintiff has abandoned the bulk of her claims. First, she has explicitly abandoned what she labels her Title VII "associational" claim--i.e., that Defendants retaliated against her for expressing her desire to hire African-Americans instead of whites.  (Pl.'s Resp. to Mot. for Summ. J. at 11-12.)  Plaintiff has also explicitly abandoned her Title VII

evidence or arguments pertinent to motions presently before the Court. Simply put, any arguments not raised in the case *sub judice* are deemed waived for the purposes of resolving the parties' motions.

[2]By filing an amended complaint, Plaintiff abandoned her original pleading.  See, e.g., Dresdner Bank AG v. M/V Olymbia Voyager, 463 F.3d 1210, 1215 (11th Cir. 2006).  Accordingly, the Court does not consider the original complaint herein.

claims for hostile work environment and failure to promote. (Id. at 15.) Plaintiff's response brief also purportedly "waives" her "straight disability claim," leaving her "retaliation" claim--i.e., that Defendants overworked her and terminated her in response to her requests for accommodation-- as her sole claim under the ADA. (Id.) During oral argument before the Honorable Dudley H. Bowen, Jr., United States District Judge (see doc. no. 97), Plaintiff's counsel further clarified that Plaintiff has abandoned all of her claims except: (1) a § 1981 retaliation claim relating to her complaints about discriminatory hiring, (2) an ADA retaliation claim relating to her complaints about failure to accommodate, and (3) an intentional infliction of emotional distress claim. Consequently, the Court hereinafter limits its consideration to these three remaining claims.

In their motion for summary judgment, Defendants argue that the entity "Beauty Systems Group, Inc." ("BSG") is Plaintiff's employer and the only proper defendant in this case. Therefore, Defendants urge that "Alberto-Culver USA, Inc." ("AC") and "Sally Beauty Company" ("SBC") are not proper parties and should be dismissed. Defendants also urge that Plaintiff's claims fail on the merits. Before analyzing the merits of Defendants' motion, the evidentiary issues raised by the parties' motions to strike must be addressed.

## II.  PRELIMINARY ISSUES

### A.    Defendants' Motion to Strike (Doc. no. 69.)

First, Defendants ask the Court to strike portions of
Plaintiff's declaration and attached exhibits, the declaration
of Mark Hegre (Plaintiff's ex-husband), and the declaration of
Paula Kaylor (a former co-worker of Plaintiff).  Defendants
argue that various portions of these documents are not
competent evidence because they constitute hearsay, are merely
conclusory, or are affirmatively contradicted by Plaintiff's
own deposition testimony.  Defendants also urge the Court to
exclude a letter Plaintiff allegedly gave Mr. Norris on
February 28, 2003.  (See Pl.'s Decl. Ex. 2.)  Defendants note
that Plaintiff's counsel did not tender this letter to defense
counsel until two months after the close of discovery.
Finally, Defendants urge the Court to strike Ms. Kaylor's
declaration in its entirety and to sanction Plaintiff's counsel
because he interviewed Ms. Kaylor, who was then a managerial
employee of Defendant BSG, without defense counsel's consent.[3]
Defendants contend that this conduct violated Rule 4.2(a) of
the Georgia Rules of Professional Conduct and the dictates of
Local Rule 83.5(d).

In response, Plaintiff defends every challenged paragraph
of the declarations at issue.  Plaintiff's counsel also
explains that he informed defense counsel of the existence of

_____

[3]At the time of the interview, Ms. Kaylor was on a medical leave of
absence.

4

the February 2003 letter, but that the letter was not physically discovered until after the close of the discovery period. Plaintiff also argues that Defendants should have been aware of the actual contents of the letter, irrespective of Plaintiff's failure to produce it in timely fashion. Finally, Plaintiff's counsel defends his own conduct and incidentally charges defense counsel with attempting to frustrate his efforts to depose Ms. Kaylor.

To begin, the Court addresses Defendants' concerns regarding inadmissible hearsay, conclusory statements, and contradictions between Plaintiff's declaration and her earlier deposition testimony. "Evidence inadmissible at trial cannot be used to avoid summary judgment." <u>Broadway v. City of Montgomery, Ala.</u>, 530 F.2d 657, 661 (5th Cir. 1976); <u>see also</u> <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999). Likewise, "[e]ven on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge." <u>Citizens Concerned About Our Children v. School Bd. of Broward County, Fla.</u>, 193 F.3d 1285, 1295 n.11 (11th Cir. 1999) (*per curiam*). And of course, "a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation." <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 656 (11th Cir. 1984). In other words, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of

5

any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Id. at 657.

Upon review of the record, it is clear that Defendants raise some valid evidentiary concerns, although many of the averments objected to are simply immaterial or irrelevant to deciding Defendants' motion for summary judgment. The Court **GRANTS** Defendants' motion to strike (doc. no. 69) to the extent it correctly identifies statements which are not admissible evidence. Accordingly, a number of Defendants' objections are sustained.

First, Defendants object to Plaintiff's statement that she "understand[s]" that Mr. Hegre "talked to [Mr.] Norris." (Pl.'s Decl. ¶ 34.) This objection is **SUSTAINED** because the statement is not based on personal knowledge. Next, Defendants object to Plaintiff's statement that pricing for BSG products was done by Defendant SBC. (See id. ¶ 94.) Because this statement is a conclusion unsupported by any evidence, Defendants' objection is **SUSTAINED**. Defendants also object to Plaintiff's recount of a story she heard from a coworker regarding alleged sexual harassment at a BSG store in Savannah, Georgia. (See id. ¶¶ 133-148.) As these statements are hearsay, Defendants' objections are **SUSTAINED**.

Next, the Court turns to Defendants' objection to Plaintiff's statement that she did not know she could appeal

her termination (see id. ¶ 683); as this statement is directly contradicted by Plaintiff's admission that she was aware of BSG's policies in this regard (see Pl.'s Dep. at 248-49), this objection is likewise **SUSTAINED**. Finally, Defendants object to Mr. Hegre's opinions regarding his ex-wife's work ethic, her health, her work hours, staffing levels at BSG stores, Mr. Norris's opinion of Plaintiff's condition, and the decision to terminate Plaintiff. (See Mark Hegre Decl. ¶¶ 6-11, 21, 23-24, 27, 36-37, 42, 56-57, & 62.) As these statements are a hodgepodge of hearsay and patently unsupported opinion testimony, Defendants' objections are **SUSTAINED**.

That said, the Court overrules the balance of Defendants' objections. First, Defendants object to Plaintiff's statement that Defendant AC purchased "Macon Beauty Systems" in 2000. (See Pl.'s Decl. ¶ 7.) Although Defendants dispute the accuracy of this statement, the statement is simply immaterial, and the Court therefore declines to strike it. Next, Defendants object to Plaintiff's statement that she was allowed to participate in Defendant AC's "profit sharing plan"; Defendants contend that this statement is false because Plaintiff was actually allowed to participate in a plan offered by Alberto-Culver Company, a different entity. (See id. ¶¶ 16-17.) As Plaintiff's statement is immaterial to resolution of the motion for summary judgment, the Court likewise declines to strike this statement. Defendants also object to Plaintiff's statements that she is "disabled." (Id. ¶¶ 23 & 100.)

Although the Court takes up the reasonableness of Plaintiff's belief that she is disabled *infra*, her beliefs in this regard are pertinent to the case and Defendant's objection is **OVERRULED**.

Defendants' also object to Plaintiff's statement that she informed Mr. Norris of her bipolar condition in 1997; according to Defendants, this statement contradicts Plaintiff's prior testimony that she did not actually tell Mr. Norris about her condition until 2001. (<u>Compare</u> Pl.'s Decl. ¶¶ 65-66 <u>with</u> Pl.'s Dep. at 43-44.) Although it is at least arguable that these statements are contradictory, they are immaterial to the resolution of the motion for summary judgment, and Defendants' objections are accordingly **OVERRULED**.

Turning to Defendants' objections regarding statements pertaining to Plaintiff's abandoned failure-to-promote claim, the Court declines to strike these statements because they are irrelevant to resolution of Defendant's motion for summary judgment. (<u>See</u> Pl.'s Decl. ¶¶ 163 & 165.) Accordingly, these objections are **OVERRULED**. Next, the Court addresses Defendants' objections to Plaintiff's statement that her doctor gave her a note to take time off from work. (<u>See</u> <u>id.</u> ¶ 606.) Although Defendants are correct in arguing that this statement is misleading (<u>compare</u> <u>id.</u> <u>with</u> Pl.'s Resp. to Def.'s Statement of Facts ¶ 109), the Court will consider the statement and **OVERRULES** the objection.

Next, Defendants object to several of Plaintiff's

8

statements regarding what occurred on February 28, 2003, the day she was suspended from work. (See Pl.'s Decl. ¶¶ 636-40 & 643-645.) Although these statements arguably contradict Plaintiff's deposition testimony (see Pl.'s Dep. at 244-46), they are immaterial, and the objections are accordingly **OVERRULED**. The Court similarly **OVERRULES** Defendants' objections to Pl.'s Decl. ¶¶ 642, 648, 651-52,& 676 because, although these statements arguably contradict Plaintiff's prior deposition testimony, the averments are immaterial.

Defendants also object to Plaintiff's offerings of her opinion regarding staffing at her former place of employment since her termination. (See id. ¶¶ 687-88.) Although Defendants question whether such statements may be based on personal knowledge, they are simply irrelevant. Accordingly, the Court declines to strike the statements and **OVERRULES** the objection.

Finally, the Court considers Defendants' objections to various portions of Ms. Kaylor's declaration. Defendants object to numerous statements on the ground that they constitute hearsay or unsupported opinions. (See Kaylor Decl. ¶¶ 13, 38, 62, 73, 77, 90, 92, & 119.) Although the admissibility of these statements is dubious, their consideration does not alter the Court's analysis or its conclusion. Accordingly, the Court declines to strike these statements and **OVERRULES** Defendants' objections.

All that said, Defendants' requests to strike the February

2003 letter (Pl.'s Decl. Ex. 2), to strike Ms. Kaylor's affidavit wholesale, and to sanction Plaintiff's counsel are **DENIED**. Consideration of these documents (to the extent they otherwise constitute admissible evidence) does not alter the Court's analysis. Finally, upon due consideration, the Court does not determine that attorney discipline under Local Rule 83.5 is appropriate at this time, and Defendants' request to sanction Plaintiff's counsel is **DENIED**.

**B.    Plaintiff's Motion to Strike (Doc. no. 73.)**

Next, the Court turns to Plaintiff's request to strike the declaration of Mr. Raal Roos, Vice President and General Counsel for BSG. Defendants first submitted this declaration along with their reply to Plaintiff's response to their motion for summary judgment. Plaintiff argues that Mr. Roos's declaration is untimely and that it is improper for Defendants to present completely "new" evidence in a reply.

Although it might be improper to raise completely new issues or facts in a reply, <u>see, e.g.</u>, <u>Fisher v. Ciba Specialty Chem. Corp.</u>, 238 F.R.D. 273, 311 n.82 (S.D. Ala. 2006), Mr. Roos's declaration simply reiterates Defendants' original argument that AC and SBC are separate legal entities from BSG and thus not proper parties to this suit. In other words, contrary to Plaintiff's argument, the declaration is not "new" evidence, but simply supplements an argument Defendants have maintained throughout this litigation. Consequently, the Court concludes that Defendants' filing of Mr. Roos's declaration was

10

proper.[4]  See Clinkscales v. Chevron U.S.A., Inc., 831 F.2d 1565, 1568 n.8 (11th Cir. 1987) (noting that district court's local rules allowed for submission of new evidence in reply to arguments raised in response to summary judgment motion); Dracz v. Am. Gen. Life Ins. Co., 427 F. Supp. 2d 1165, 1168 (M.D. Ga. 2006) (allowing summary judgment movant to provide supplemental evidence in its reply).  Accordingly, Plaintiff's motion to strike is **DENIED**.

### III.  UNDERLYING FACTUAL BACKGROUND

In 1997, Mr. Norris hired Plaintiff to manage Beautician's Supply, a beauty supply store in Augusta, Georgia, operating under the name "Macon Beauty Systems." (Pl.'s Dep. at 12.)  In January 2000, BSG acquired Beauticians Supply. (Norris Dep. at 4, 28.)

When BSG acquired Beauticians Supply, Plaintiff retained her position as store manager, but was required to complete an application for employment with BSG.[5]  (Pl.'s Dep. at 238.)

---

[4]Of note, in an Order dated June 6, 2005, Judge Bowen granted Plaintiff permission to file a sur-reply and evidence to rebut Mr. Roos's declaration. Cf. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 410 (1st Cir. 1985) (explaining that nonmoving party should have opportunity to examine and reply to moving party's reply brief and supplemental affidavits containing new evidence prior to hearing and disposition of summary judgment motion).  Judge Bowen's June 2005 Order comports with the Local Rules regarding replies and sur-replies.  See, e.g., Podger v. Gulfstream Aerospace Corp., 212 F.R.D. 609, 609 (S.D. Ga. 2003) ("parties may file as many reply briefs as they want").  This is not a case in which a summary judgment movant has been allowed to submit new evidence without also giving the non-movant opportunity to respond.  Cf. Lewis v. Zilog, Inc., 908 F. Supp. 931, 959 (N.D. Ga. 1995) (refusing to consider evidence submitted along with reply brief where local rules did not allow for sur-reply).

[5]BSG is a subsidiary of Victory Beauty Systems, Inc. ("Victory"). (Roos Decl. ¶ 6.)  Victory and SBC are subsidiaries of Sally Holdings, Inc ("Sally").  (Id. ¶ 5.)  Sally and Defendant AC in turn are subsidiaries of Alberto-Culver Company, a publicly-traded corporation.  (Id. ¶ 4.)  None

Plaintiff received a copy of BSG's employment handbook and was made aware of BSG's termination policy, which provided that an employee could be fired for the use of profanity towards a coworker or supervisor. (Id. at 56-57; see also Krimmer Dep. at 53.) On February 28, 2003, Plaintiff was fired, ostensibly for "engag[ing] in a verbal altercation with her supervisor and call[ing] him a vulgar and inappropriate name." (Pl.'s Decl. Ex. 4 at 1.)

At the time Plaintiff was originally hired to manage the Augusta Store, she already suffered from bipolar disorder and hypertension. (See, e.g., Pl.'s Dep. at 14.) When Plaintiff accepted the position as store manager, she gave Mr. Norris an insurance form indicating that she was taking Lithium. (Id. at 13.) Since Plaintiff began receiving treatment for bipolar disorder, her doctors have changed her medications "several times," but the record provides no indication that these changes have impacted Plaintiff's ability to work. (Id. at

---

of these parent-subsidiary corporations share day-to-day operations or accounting records. (Id. ¶¶ 7-10.) Of particular import, BSG controls setting its employees' pay, formulating job expectations, evaluating its employees' performance, and employment decisions such as hiring, firing, demotion, and employee discipline. (Id. ¶ 12.) As noted supra, Defendants argue that under these facts, only BSG may be considered Plaintiff's "employer."

In contrast, Plaintiff argues that the above-listed corporations should be considered a single employer for purposes of liability under § 1981 and the ADA. In support of this argument, Plaintiff notes that when she became an employee of BSG, she was eligible to participate in employee benefit plans offered by Alberto-Culver Company. (See Pl.'s Decl. ¶¶ 16-17; see also Roos Decl. ¶ 11.) Plaintiff also notes that these corporations share the common purpose of making and selling beauty products, and argues that filings with the Securities and Exchange Commission show that they are really just "one big company." (Pl.'s Sur-Reply at 3.) In further support of this contention, Plaintiff offers that Mr. Roos is a corporate officer of both BSG and Sally. (Id. at 5.)

The Court resolves this issue infra at Part V-A.

14.) Of note, Plaintiff's disorder usually does not affect her productivity; in fact, when Plaintiff experiences an "episode," she actually becomes more productive. (*Id.* at 18.) Also of note, according to Plaintiff, only close friends and family are able to tell when Plaintiff begins showing signs of the onset of an episode. (*Id.* at 20.) That said, during her tenure at the Augusta store, Plaintiff had episodes in 1998 and 2001 which ultimately required hospitalization. (*Id.* at 19, 35-36.) After both hospitalizations, Plaintiff was allowed to return to work and to keep her position as manager. (*Id.* at 31-32, 52.)

Notably, Plaintiff admits that her condition generally did not prevent her from performing any of her job duties (*id.* at 270-71), and Plaintiff describes her work as not stressful (*see id.* at 81). Nevertheless, at several points during her tenure, the Augusta store had difficulty hiring and retaining sufficient staff, forcing Plaintiff to work long hours at various times during her employment. (*See, e.g., id.* at 24, 32-33, 46, 88.) According to Plaintiff, in the fall of 2002, her doctors wanted her to change medications and take at least a three-week vacation. (*Id.* at 46-47.) Simultaneously, business at the Augusta store accelerated, and there were glitches in the transition to a new computer system--these factors only exacerbated the problem. (*Id.* at 91.) In September 2002, Plaintiff verbally requested to take a vacation; she was asked to ensure that the store's operations would not be disrupted during her absence. (*Id.* at 62-63.)

13

Because the need to take time off was not an "emergency," Plaintiff kept putting off her plans to take a break from work, hoping to wait until the staffing problems at the Augusta store had been solved, or at least alleviated. (Id. at 47-48, 62.) The problem never improved. (Id. at 62-63.) Despite letting Mr. Norris know she needed time off, she never submitted any medical documentation substantiating her need to take a three-week leave of absence. (Id. at 64-65.) Neither did she ever provide a doctor's note indicating that she needed "a reduced schedule." (Id. at 75.)

Over the course of her tenure, Plaintiff hired four employees: Paula Kaylor, a full-time assistant manager, and three part-time sales associates, Teresa Cain, Charrity Annis, and Kim Gracey. (See, e.g., id. at 49, 72.) According to Plaintiff, despite these hires, she remained overworked. In fact, by early 2003, none of Plaintiff's hires were working at the Augusta store, leaving Plaintiff the sole onsite employee. (Id. at 97.) Ms. Kaylor, who had frequent conflicts with Plaintiff, wound up taking an extended medical leave of absence in early February 2003. (Id. at 99.) Ms. Cain, Ms. Annis, and Ms. Gracey quit. According to Plaintiff, the store had become a negative environment even before these employees quit, as Ms. Kaylor and Ms. Annis were completely "unmanageable." (Pl.'s Decl. ¶¶ 270-71.) In order to help the staffing situation, on several days employees from other stores were brought in; according to Plaintiff, however, these employees were

14

essentially useless.  (Pl.'s Dep. at 103-04.)

Because of employee turnover, at several points in Plaintiff's tenure at the Augusta store, including late 2002, she and Mr. Norris looked for new employees.  Although Plaintiff repeatedly asked to place an ad in the newspaper, Mr. Norris usually encouraged her to hire people she knew; each of the four employees hired by Plaintiff were personal friends or acquaintances of Plaintiff.  (Id. at 108.)  According to Defendants, BSG disfavored the use of ads because they were expensive and resulted in job applicants with little pertinent experience, while references from employees and customers tended to be more effective at identifying qualified applicants.  (Krimmer Dep. at 33.)

According to Plaintiff, Mr. Norris told her in 1998 that he disfavored newspaper ads because only African-Americans would respond.  (Pl.'s Dep. at 132.)  Also of note, in 2000 Mr. Norris allegedly rejected Plaintiff's suggestion that the Augusta store begin carrying "ethnic" hair products.  (Id. at 138.)  Yet, during the staffing crisis in late 2002 and early 2003, the hiring process was changed.  Mr. Norris and Doug Olson, BSG's human resources director, gave Plaintiff approval to run an ad in a local newspaper.  (Id. at 113.)  Mr. Norris also took over the hiring process; according to Mr. Joseph Krimmer, the Regional Manager and Mr. Norris's supervisor, he asked Mr. Norris to become more involved in the hiring process because of problems with Plaintiff's previous hires.  (Krimmer

15

Dep. at 19.)

Many people responded to the ad, but Mr. Norris favored Ms. Brenda Highfield, who "wandered in" before the ad was published. (Pl.'s Dep. at 115.) According to Plaintiff, Ms. Highfield would have made a "good potential employee." (<u>Id.</u> at 117.) Despite Mr. Norris's best efforts to convince her to work for BSG, Ms. Highfield ultimately turned down the job in late February 2003. (<u>See generally</u> Highfield Decl.)

Of import to this suit, in choosing to offer the job to Ms. Highfield, Mr. Norris allegedly rejected Plaintiff's recommended applicants--two African-American women. (<u>See</u> Pl.'s Dep. at 124, 127.) According to Plaintiff, she saw Mr. Norris putting "marks" on applications from people with names that "sounded" African-American. (<u>Id.</u> at 122-23.) Plaintiff allegedly confronted Mr. Norris by telling him he could not mark the applications "in any way," but she did not directly accuse him of racial discrimination. (<u>Id.</u>) According to Plaintiff, she was not sure of Mr. Norris's "intention," and she did not formally "complain" about this alleged discrimination. (<u>Id.</u> at 130-31.) That said, she did allegedly share her suspicions with Mr. Krimmer at some point.[6] (<u>Id.</u> at 142.)

Meanwhile, the working environment at the Augusta store deteriorated. Frustrated by their bad attitudes, Plaintiff

---

[6]Although Mr, Krimmer admits that Plaintiff once complained that Mr. Norris was "mean" to her, he denies that Plaintiff complained about racial discrimination. (Krimmer Dep. at 70.)

complained about Ms. Annis and Ms. Kaylor to Mr. Krimmer, who instructed her to take action to ensure that her employees performed to her expectations. (Krimmer Dep. at 42-43, 49.) Mr. Krimmer then asked Mr. Norris to increase his visits to the Augusta store to determine the cause of the personnel problems there. (Id. at 40-41.) When the situation did not improve, Plaintiff decided to issue written warnings to Ms. Kaylor and Ms. Annis for their unprofessional conduct. (See Pl.'s Dep. Ex. 6.) Ms. Kaylor responded by writing a note to Mr. Olson, complaining, among other things, that Plaintiff was a poor manager. (Pl.'s Dep. at 284; Pl.'s Dep. Ex. 6.)

After this letter, Mr. Norris met individually with Plaintiff, Ms. Kaylor, and Ms. Annis to discuss the situation. (Norris Dep. at 53.) In mid-February, Mr. Norris gave Plaintiff a written "corrective action" citing her failure to maintain a professional environment and to manage her employees; Mr. Norris was also concerned about the store's appearance. (See Pl.'s Dep. at 228, 233, 238-39; Pl.'s Dep. Ex. 4; Norris Dep. at 23, 50-51.) Mr. Krimmer shared Mr. Norris's concerns regarding Plaintiff's management and the "high turnover" at Plaintiff's store, as well as the overall appearance of the store, which had become a noticeable problem. (See Krimmer Dep. at 23-25.)

Plaintiff contends that, when Mr. Norris gave her the "corrective action," his behavior was intimidating and frightened her. According to Plaintiff, Mr. Norris was

17

determined to get rid of her because she constantly revealed his incompetence as a district manager and made him look bad in front of Mr. Krimmer. (Pl.'s Dep. at 226-30.) Meanwhile, also in mid-February 2003, Plaintiff started having more serious problems with her blood pressure.

Armed with a doctor's note, Plaintiff requested and took two days off after she experienced a nosebleed caused by her hypertension. (Id. at 103, 172.) Mr. Norris arranged for an employee from another store to work at the Augusta store during Plaintiff's absence. (Id. at 171-74.) That said, as February drew to a close, Plaintiff had still not taken the three-week vacation she wanted.

On Friday, February 28, 2003, at approximately 1:00 p.m., Plaintiff gave Mr. Norris a letter indicating that she would be absent from work on March 1-2, 2003. (See id. at 167-69, 171, 177-78, 244; see also Norris Dep. at 68-69; Pl.'s Decl. Ex. 2.) The letter complained that Plaintiff was "overextended" but did not further explain Plaintiff's anticipated absence. (Pl.'s Decl. Ex. 2.) Earlier in the week, Plaintiff filled out a request for medical leave, although there is no indication that this request was processed or even sent to BSG's human resources department. (See Pl.'s Decl. Ex. 1; see also Pl.'s Dep. at 192.) Plaintiff did not submit any medical documentation.[7] (Norris Dep. at 71-72; Bartrug Decl. ¶ 6.)

---

[7]Indeed, Plaintiff turned down her doctor's offer to write a recommendation that she work reduced hours. (Nelson-Abbott Decl. ¶ 30.)

Later that afternoon, Plaintiff and Mr. Norris got into an argument regarding whether it was Plaintiff's responsibility to ensure that the store was "covered" before she absented herself for the weekend. (See Norris Dep. at 69; Pl.'s Dep. at 245.) According to Mr. Norris, during this conversation Plaintiff called him an "asshole." (Norris Dep. at 72, 75.) While in Plaintiff's presence, Mr. Norris called Mr. Olson to inform him of what had just happened. (Pl.'s Dep. at 246.) After informing Mr. Olson of the alleged profanity, Mr. Norris suspended Plaintiff without pay; on March 4, 2003, she was fired. (Id. at 247; see also Norris Dep. at 72, 79.)

The decision to terminate Plaintiff was made by both Mr. Krimmer and Mr. Olson. (See Krimmer Dep. at 52, 57-58). According to Plaintiff, Mr. Norris did not have the authority to fire her. (See Pl.'s Dep. at 249.) Although Plaintiff disputes using profanity, she did not appeal her suspension or her termination to Mr. Krimmer, Mr. Olson, or BSG's human resources department. (Id. at 247-49.) In fact, she made no attempt to contact Mr. Krimmer, Mr. Olson, or anyone else at BSG to dispute Mr. Norris's version of the events. (Id.)

In June and October 2003, respectively, Plaintiff filed two charges with the Equal Employment Opportunity Commission ("EEOC"), raising the same claims as in the instant litigation. The EEOC dismissed both charges (see Bartrug Decl. Exs. 2-6), and Plaintiff brought the instant suit on October 30, 2003.

## IV. REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-movant, _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," _United States v. Four Parcels of Real Property_, 941 F.2d 1428, 1437 (11th Cir. 1991) (_en banc_) (internal punctuation and citations omitted).

The movant has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. _Fitzpatrick v. City of Atlanta_, 2 F.3d 1112, 1115 (11th Cir. 1993). If the _movant_ bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." _Four Parcels_, 941 F.2d at 1438. On the other hand, if the _non-movant_ has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to

20

the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) & Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If--and only if--the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. Anderson, 477 U.S. at 249. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If

21

the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed. R. Civ. P. 56.

The Clerk has given the non-movant notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. no. 41.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (*per curiam*), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## V.  DISCUSSION

### A.    Who was Plaintiff's "Employer"?

Although it is undisputed that BSG was Plaintiff's employer, as elucidated *supra* at footnote 6, Plaintiff has also sued Defendants SBC and AC, contending that all three corporations should be viewed as a single entity for the purposes of liability under § 1981 and the ADA. Plaintiff has

22

also moved to amend her complaint to add Alberto-Culver Company, the ultimate parent corporation of Defendants, as a party defendant. (Doc. no. 89.) For the reasons outlined below, Defendants SBC and AC are **DISMISSED**, and Plaintiff's motion to amend is **DENIED** as both untimely and futile.

Generally, in order to sue multiple entities under federal anti-discrimination laws, such as § 1981 or the ADA, an employee must show that the entities function as a "single employer" or an "integrated enterprise."[8] Player v. Nations Biologics, Inc., 993 F. Supp. 878, 881 (M.D. Ala. 1997). To determine whether entities are an integrated enterprise, the Court must consider "the following criteria: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Id. (citing McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987)). No single factor is controlling; rather, these criteria simply serve as a framework for assessing "the degree of control an entity has over the adverse employment decision[s]" which gave rise to the suit. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1244-45 (11th Cir. 1998).

While arguing that each of the corporate entities at issue here should be considered "one big company," Plaintiff makes little attempt to address the above factors. In support of her

---

[8]The Court is aware that multiple entities can also be sued together under a "joint employer" theory, see, e.g., Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1257-58 (11th Cir. 2004); however, Plaintiff has produced no evidence in support of such a theory.

contention, Plaintiff relies upon the following facts: (1) upon BSG's acquisition of Beautician's Supply, Plaintiff was given an SBC Personnel Manual; (2) Plaintiff was eligible to participate in an Alberto-Culver Employee Profit-Sharing Plan; (3) the entities Plaintiff wishes to sue are all involved in the cosmetics business; and (4) Mr. Roos is a corporate officer of both SBC and BSG.

These facts fall far short of establishing a genuine issue of fact regarding the existence of an integrated enterprise. In assessing whether corporate entities have interrelated operations, courts consider whether the businesses have "combined accounting records, bank accounts, lines of credit, payroll preparation, switchboard, telephone numbers, or offices." See Clark v. St. Joseph's/Candler Health Sys., Inc., CV 405-119, 2006 WL 2228929, at *5 (S.D. Ga. Aug. 3, 2006) (Moore, C.J.) (citing Fike v. Gold Kist, Inc., 514 F. Supp. 722, 726 (N.D. Ala.), aff'd, 664 F.2d 295 (11th Cir. 1981)). There is no evidence of such interrelation in this case. In this regard, the Court notes that, "the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations." Pearson v. Component Tech. Corp., 247 F.3d 471, 501 (3d Cir. 2001). Thus, the fact that Mr. Roos or some other person may serve as an officer in more than one of the entities at issue is

insufficient to establish interrelated operations.

Indeed, aside from the use of an employee handbook and a common employee profit-sharing plan, Plaintiff has presented no proof that any of these entities share employees or resources. Nor would one expect all the entities under the "Alberto-Culver umbrella," as Plaintiff calls it, to do so. (See, e.g., Pl.'s Decl. ¶ 10.) Contrary to Plaintiff's assertion that the Alberto-Culver family of corporations are focused solely on the cosmetics business, Plaintiff herself has also contended that the corporations under the "umbrella" include businesses that produce other products, such as "Molly McButter" and "Mr. and Mrs. Dash." (Id. ¶ 11.)

More to the point, the SBC handbook and the profit-sharing plan are not evidence of centralized labor relations. Plaintiff has put forward no reason to suppose that Mr. Roos or any other employee of SBC, AC, or Alberto-Culver Company plays any role in the day-to-day management or personnel decisions of BSG. Furthermore, aside from Mr. Roos's positions in SBC and BSG, there is no evidence that BSG, SBC, AC, or Alberto-Culver Company share common board members, officers, or employees.

That said, given Defendants' parent-subsidiary relationships and Mr. Roos's roles in both SBC and BSG, Plaintiff has presented some evidence of common managment and common ownership or financial control. Nevertheless, "courts have recognized that the mere existence of common management and ownership are not sufficient to justify treating a parent

corporation and its subsidiary as a single employer." Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997); see also Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1257 (11th Cir. 2004) (holding that common ownership is insufficient to show that entities are a single employer under the Family and Medical Leave Act).

In sum, Plaintiff has not presented evidence from which a reasonable juror could conclude that any entity other than BSG may be considered her employer. There is simply no indication that Alberto-Culver Company, AC, or SBC had anything to with the terms and conditions of Plaintiff's employment or her termination. Consequently, the Court lacks jurisdiction over these entities. Accordingly, Defendants SBC and AC are **DISMISSED**, and Plaintiff's motion to amend her complaint to add Alberto-Culver Company as a defendant (doc. no. 89), submitted seven months after the close of discovery and well past the motions-filing deadline, is **DENIED** as both untimely and futile. See United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Ind. v. Georgia Power Co., 684 F.2d 721, 724 (11th Cir. 1982) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

**B. Plaintiff's Retaliation Claims Fail as a Matter of Law.**

First, the Court addresses Plaintiff's ADA retaliation claims. In order to prove an ADA retaliation claim, Plaintiff must show: "(1) [she] 'engaged in conduct protected by the ADA'; (2) [she] 'was subjected to an adverse employment action at the time, or after the protected conduct took place'; and

26

(3) the defendant 'took an adverse employment action against [her] because of [her] protected conduct.'" Collado v. United Parcel Serv. Co., 419 F.3d 1143, 1158 (11th Cir. 2005) (citation omitted). Here, Plaintiff contends that Defendant BSG retaliated against her for requesting accommodation (*i.e.*, time off) by overworking her and terminating her.

Initially, Plaintiff's "overwork" retaliation claim fails due to lack of causation. At various points throughout her tenure at BSG, including the months leading up to her termination, Plaintiff worked long hours because the Augusta store was understaffed. There is no evidence that this understaffing bears any causal relationship to Plaintiff's requests for accommodation. Plaintiff was empowered to hire employees and actually hired four people to staff the store. Unfortunately, none of these employees became long-term solutions to the store's staffing needs. By February 2003, Ms. Kaylor had taken a medical leave of absence, while the other employees were no longer working for BSG.

There is no evidence that Defendant BSG devised this situation; indeed, both Mr. Norris and Plaintiff were working to hire a new employee at the time Plaintiff was terminated. Mr. Norris had in fact extended a job offer to Ms. Highfield, whom Plaintiff thought would make a good employee, but Ms. Highfield declined the offer on the eve of Plaintiff's termination. Furthermore, because the understaffing problem existed both before and after Plaintiff requested

27

accommodation, there is no basis for Plaintiff's belief that the store was deliberately understaffed so that Plaintiff would be overworked and eventually forced to quit. See Collado, 419 F.3d at 1159 (quoting Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999) ("'At a minimum, [the plaintiff] must show that the adverse act followed the protected conduct.'"). In sum, although it is clear that Defendant BSG did not want the store's operations interrupted, there is no evidence that Mr. Olson, Mr. Krimmer, Mr. Norris, or anyone else at BSG intentionally understaffed the store.

More generally, although Plaintiff need not prove that she is actually disabled under the ADA to bring a retaliation claim, she must show that she had "a good faith, objectively reasonable belief that [she] was entitled to [the requested] accommodations under the ADA." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998). In other words, Plaintiff must show that "[her] belief that [she] was disabled was objectively reasonable." Id. Here, there is no evidence to support an inference that Plaintiff reasonably believed she was disabled. Plaintiff has abandoned her assertion that she is disabled. In order to reasonably believe one is entitled to accommodation under the ADA, it must at least be arguable that one's impairments (here, a heart condition and bipolar disorder) "substantially limit a major life activity."[9] Id.

_____

[9]The major life activities enumerated by an EEOC regulation are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

28

In determining whether an impairment substantially limits a major life activity, the Court considers: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. Here, although Plaintiff's heart condition and bipolar disorder appear to be permanent conditions, there is no indication that they have been of such sustained severity that they substantially limit any of Plaintiff's major life activities, including working.[10] Although Plaintiff was hospitalized in 1998 and 2001, Plaintiff had no further episodes, and there is no evidence that Plaintiff's ability to work or perform any other major life activity was substantially impaired by her conditions from 2001 until her termination in 2003. Indeed, Plaintiff has contended that, throughout this period, she was fully able to perform her job functions. (See Pl.'s Dep. at 270-71.) Consequently, Plaintiff has failed to offer any evidence to support a reasonable belief that she is disabled.

Assuming *arguendo* that Plaintiff had established a *prima facie* case of retaliation, Defendant BSG has offered a legitimate, nondiscriminatory reason for Plaintiff's

---

[10]A person is substantially limited in the major life activity of working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(I); see Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) ("To be substantially limited in the major life activity of working . . . then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); Standard, 161 F.3d at 1327.

termination: her use of profanity toward her supervisor. Once the employer has articulated a legitimate, non-retaliatory reason for its employment action, the burden shifts to the plaintiff to produce evidence that the reason is pretext for retaliation. See Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).

In the instant case, it is undisputed that Mr. Norris telephoned Mr. Olson to tell him about the alleged incident. Although Mr. Krimmer ratified the decision to fire Plaintiff, it also undisputed that Mr. Krimmer relied upon Mr. Olson's judgment. (See Krimmer Dep. at 52, 57-58.) Thus, at issue is whether there is a genuine dispute of fact as to whether Mr. Olson and Mr. Krimmer acted in good faith:

> If an employer discharges an individual under an honest belief pursuant to the information available to the employer that the employee has violated a policy of the employer, the fact that the employer's belief may be mistaken or wrong in fact does not mean that such belief cannot constitute a legitimate reason for the employer's discharge of the plaintiff.

Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452 (11th Cir. 1987).

Here, Plaintiff provides no evidence from which to infer that Mr. Olson and Mr. Krimmer did not believe Mr. Norris's accusation. Of particular note, Plaintiff has not alleged that Mr. Olson, to whom Mr. Krimmer deferred, was even aware of her requests for accommodation, much less that Mr. Olson was motivated by retaliatory or discriminatory animus. Rather, Plaintiff complains that Mr. Krimmer and Mr. Olson did not

adequately investigate Mr. Norris's accusation. Given Plaintiff's utter failure to contact Mr. Krimmer, Mr. Olson, or anyone else at BSG to challenge her suspension or termination in any way, this argument rings hollow. Regardless, Plaintiff's argument clouds the issue, which is not whether Mr. Olson or Mr. Krimmer adequately investigated Mr. Norris's accusation, but whether there is a genuine issue of fact regarding their good faith. <u>Kariotis v. Navistar Intern. Transp. Corp.</u>, 131 F.3d 672, 677 (7th Cir. 1997).

Of course, Plaintiff points to the close temporal proximity between her latest request for time off and her termination as proof of retaliation. The problem with this argument is that it is simply a restatement of her *prima facie* case, and not a response to Defendant BSG's justification for her termination. As noted above, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).

Other than to deny Mr. Norris's accusation, Plaintiff points to no evidence from which to infer that Mr. Krimmer or Mr. Olson used the accusation as pretext for retaliation. Of note, Plaintiff does not even attribute discriminatory or retaliatory animus to Mr. Olson, to whom Mr. Krimmer deferred in agreeing to fire Plaintiff. Given Plaintiff's failure to attack Mr. Olson's motives, Plaintiff's ADA retaliation claims

fail as a matter of law.

Finally, the Court addresses Plaintiff's § 1981 retaliation claim.[11] The Eleventh Circuit has indicated in other contexts that claims brought under § 1981 should be analyzed under the same framework as Title VII claims because both statutes have the same requirements of proof. See Standard, 161 F.3d at 1330. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000). If the adverse employment action is taken without knowledge of the

---

[11] The Court should note that, in the Eleventh Circuit, "the scope of relief available under § 1981 with respect to retaliation claims appears to remain largely an open question." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1463 (11th Cir. 1998). The Eleventh Circuit has recently provided, albeit in an unpublished opinion, that a claim may be brought under § 1981 for "retaliation for a plaintiff's opposition to race discrimination, whether or not he personally is the victim of that race discrimination." Tucker v. Talladega City Schools, 171 Fed. Appx. 289, 295 (11th Cir. Mar. 20, 2006) (citing Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1007 (11th Cir. 1997)). That said, the Eleventh Circuit has also indicated that, because § 1981 is "concerned with *racial* discrimination in the making and enforcement of contracts," no retaliation claim will lie unless the retaliation is leveled against the plaintiff "due to his race." Little v. United Technologies, 103 F.3d 956, 961 (11th Cir. 1997).

In Tucker, an African-American employee was allowed to bring a claim based on his complaints on behalf of other African-Americans; the Eleventh Circuit distinguished this set of facts from Little, in which a white employee complained about a coworker's use of a racial slur to describe an African-American. Tucker, 171 Fed. Appx. at 296. In contrast, in the instant case, Plaintiff, a white woman, alleges that she was fired for opposing discrimination aimed at African-Americans. Thus, it is at least arguable that her retaliation claim is not cognizable under § 1981. All that said, the best course is to follow the conclusion of most courts to address the issue--namely, that § 1981 protects white plaintiffs who seek to vindicate the rights § 1981 guarantees to minorities. See Welzel v. Bernstein, 436 F. Supp. 2d 110, 118 (D.D.C. 2006).

protected activity, there can be no retaliation. Id. at 590.

Initially, there is some question regarding whether Plaintiff engaged in protected activity. Plaintiff contends that Mr. Norris rejected her recommendations to hire two African-Americans and that she confronted him about "marking" job applications. She concedes that she did not directly accuse Mr. Norris of discrimination. Thus, it is not entirely clear that Plaintiff actually opposed a discriminatory practice. That said, given Plaintiff's allegation that she shared her suspicions with Mr. Krimmer, the Court concludes that Plaintiff did engage in protected activity for the purposes of this motion.

Nevertheless, Plaintiff's § 1981 retaliation claim suffers from the same fundamental flaw as her ADA claims. Plaintiff has not alleged that Mr. Olson, who recommended Plaintiff's termination, was even aware of her objection to Mr. Norris's allegedly discriminatory practices, much less that Mr. Olson intended to retaliate against her. Plaintiff's failure to attribute any discriminatory or retaliatory animus to Mr. Olson is fatal to her claims. It is also noteworthy that Plaintiff does not allege that Mr. Olson or Mr. Krimmer handled this disciplinary matter differently from any other incident because of her alleged disability, her requests for accommodation, or her alleged opposition to unlawful practices.

In sum, Plaintiff points to no evidence from which to infer that Mr. Krimmer and Mr. Olson used Mr. Norris's

33

accusation as pretext for retaliation. Plaintiff does not even dispute whether Mr. Olson genuinely believed Mr. Norris's accusation. Accordingly, the Court determines that Defendants are entitled to summary judgment as to all of Plaintiff's federal claims.

## C. The Remaining State Law Claim Should Be Dismissed.

The sole remaining claim in this case is Plaintiff's state law claim for intentional infliction of emotional distress. Because jurisdiction over this claim rests solely upon 28 U.S.C. § 1367, the absence of a federal claim places supplemental jurisdiction in doubt. 28 U.S.C. § 1367(c)(3). Accordingly, Plaintiff's state law claim is **DISMISSED WITHOUT PREJUDICE**. Id.; see also Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999).

## VI. CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**, Defendants' motion to strike is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's motions are **DENIED**.[12] The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants.

**ORDER ENTERED** at Augusta, Georgia, this ___25th___ day of April, 2007.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE

_____

[12]Any pending motions not discussed herein are likewise **DENIED** as **MOOT**.

34